# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### 1:18-CV-1027

|  |  |  |
|---|---|---|
| **MOUNTAIRE FARMS INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **COMPLAINT** |
| **INDUSTRIAL CONSTRUCTION EXPERTS, INC. and KENNETH W. CRONCH,** | ) | |
| **Defendants.** | ) | |

Plaintiff Mountaire Farms Inc. ("Mountaire"), complaining of Defendants Industrial Construction Experts, Inc. ("ICE") and Kenneth W. Cronch ("Cronch"), alleges that:

## PARTIES

1.     Mountaire is a Delaware corporation with its principal place of business in Delaware.  Mountaire is an agricultural food processing company that has facilities around the United States.  Among other things, Mountaire specializes in the production of chicken for wholesale and retail markets.

2.     ICE is a North Carolina corporation with its principal place of business located at 160 S. Moore St., Ste. 4, Sanford, NC 27330.  ICE is an industrial construction company.

3.      Cronch is an adult individual and resident of North Carolina with, upon information and belief, an address at 3468 Chris Cole Road, Sanford, NC 27332.  Cronch is the sole owner and President of ICE, as well as various other corporate entities.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the matter in controversy between Mountaire and Defendants exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      This Court has personal jurisdiction over Defendants consistent with the principles underlying the U.S. Constitution and N.C. Gen. Stat. § 1-75.4.  Defendants engage in substantial activity in North Carolina, including the activity giving rise to this action.  Additionally, ICE was organized under the laws of North Carolina and has its principal place of business in Lee County, North Carolina.  Cronch is a resident of Lee County, North Carolina.

6.      Venue is proper in this Court under the provisions of 28 U.S.C. § 1391.  A substantial part of the events giving rise to Mountaire's claims occurred in this district and Defendants are subject to personal jurisdiction in this district.

## BACKGROUND FACTS

7.      Mountaire owns real property and a poultry processing plant in Siler City, Chatham County, North Carolina (the "Site").

8.      After purchasing the Site in 2016, Mountaire commenced expansion and development of the facilities at the Site to support the operations of the poultry processing plant. The project involves significant investment into the Chatham County economy.

9.      In addition to the poultry processing plant, Mountaire planned to build ancillary facilities and amenities at the Site, including a wastewater pre-treatment plant,

necessary parking spaces for employees (the "Parking Lot"), and an equipment mezzanine (the "Mezzanine").

### The Parking Lot

10. On or around April 5, 2017, Mountaire engaged ICE as contractor to oversee and manage the design and construction of the Parking Lot pursuant to a purchase order currently in the amount of $7,606,972 submitted by Mountaire to ICE (the "Parking Lot Contract"). A copy of the purchase order is attached hereto as Exhibit A.

11. ICE accepted the Parking Lot Contract by commencing work on the project.

12. ICE engaged numerous local subcontractors to supply labor and materials to complete the design and construction of the Parking Lot, including: (1) American Scale Company, Inc. ("American Scale"), (2) Hall Fencing, (3) Harrington Landscaping, LLC, (4) SPATCO Energy Solutions ("SPATCO"), (5) S.T. Wooten Corporation, (6) Caviness Farms Grading, Inc., (7) ESC Southeast, LLP, (8) Matthews Land Surveying and Mapping, PLLC, (9) Wilson & Lysiak, Inc., (10) P.R. Faulk Electric Corporation, and (11) Campbell Oil and Gas.

13. ICE submitted invoices to Mountaire for work on the Parking Lot including on May 4, 2017 ($1,560), May 25, 2017 ($47,744.63), June 25, 2017 ($344,850.00), August 25, 2017 ($2,057,530.00), November 25, 2017 ($2,114,439.08), and March 29, 2018 ($22,500.00) (collectively, the "Parking Lot Invoices").

14. Mountaire paid the Parking Lot Invoices in full.

15. As of July 3, 2018, Mountaire had paid $5,866,419 in the aggregate to ICE on the Parking Lot project.

**The Mezzanine**

16.     On or around January 17, 2018, Mountaire engaged ICE as contractor to oversee and manage the design and construction of the Mezzanine pursuant to two purchase orders in the total amount of $316,316.00 submitted by Mountaire to ICE (the "Mezzanine Contract"). Copies of the purchase orders are attached hereto as Exhibit B.

17.     ICE accepted the Mezzanine Contract by commencing work on the project.

18.     ICE engaged numerous local subcontractors to supply labor and materials to complete the Mezzanine, including: (1) Wilson & Lysiak, Inc., (2) Industrial Piping Solutions, Inc., (3) Jourdan Insulation, Inc., (4) Saf-Cut Concrete Cutting, Inc., and (5) Sunbelt Rentals, Inc.

19.     ICE submitted invoices to Mountaire on the Mezzanine on January 19, 2018 ($63,263.20) and April 9, 2018 ($94,894.80) (collectively, the "Mezzanine Invoices").

20.     Mountaire paid the Mezzanine Invoices in full.

21.     As of July 3, 2018, Mountaire had paid $158,158.00 in the aggregate to ICE on the Mezzanine project.

**ICE's Breach**

22.     On or around June 18, 2018, Mountaire became aware that ICE was not remitting payment to subcontractors on the Parking Lot and Mezzanine projects.

23.     With respect to the Parking Lot, Mountaire became aware the following subcontractors were unpaid by ICE in the following estimated amounts: (1) American Scale ($48,705.00), (2) Caviness Farms ($19,200.00), (3) SPATCO ($66,192.00), (4) S.T.

Wooten ($664,372.00), (5) P.R. Faulk ($4,800.00), and (6) ECS Southeast, LLP ($10,617.32) for a total unpaid amount of $813,886.32.

24.     With respect to the Mezzanine, Mountaire became aware the following subcontractors were unpaid by ICE in the following amounts: (1) Wilson & Lysiak Engineers ($34,700.00), (2) Industrial Piping Solutions ($149,678.00),        (3)        Jourdan Insulation, Inc.   ($14,193.84), and (4) Sunbelt Rentals ($16,718.05) for a total unpaid amount of $218,489.89.

25.     The amounts unpaid to subcontractors had been paid by Mountaire to ICE in its role as contractor on the Parking Lot and Mezzanine.  However, ICE failed to remit payment to the subcontractors for labor and materials provided on the projects.

26.     Mountaire attempted to contact ICE and Cronch, through varying channels.

27.     On June 21, 2018, Mountaire submitted a Notice of Non-Payment to ICE to bring current the payment arrearages for all subcontractors.  The letter also requested that ICE provide further assurances to Mountaire about the continuation of the work at the Site.

28.     ICE counsel responded to the letter via email and phone call to Mountaire counsel, but failed to provide assurances related to the completion of the Site projects.

29.     ICE's subcontractors began to slow and/or halt progression on the Parking Lot and Mezzanine due to uncertainty regarding (1) outstanding balances owed by ICE to subcontractors claiming payment arrears for completed work; and (2) the general contractor operating status (i.e. closing its business).

30.     Mountaire formally notified ICE of breach of the Parking Lot Contract and the Mezzanine Contract on July 3, 2018.

31.     On July 5, 2018, Mountaire became aware that ICE began informing subcontractors that it had closed its operations.

32.     Pursuant to Assignment Agreements dated July 12, 2018, ICE agreed that the Parking Lot Contract and the Mezzanine Contract were terminated and agreed to assign its subcontracts to Mountaire in order to finish the projects.  ICE also agreed that Mountaire had paid all amounts billed by ICE for work on the projects, and that Mountaire reserved all rights.  Copies of the Assignment Agreements are attached hereto as Exhibit C.

**Misappropriation of Funds**

33.     Upon information and belief, ICE and Cronch misappropriated funds received from Mountaire instead of paying subcontractors for labor and materials on the Parking Lot and the Mezzanine.

34.     Upon information and belief, Cronch used these funds to facilitate the purchase of the following: (1) a large home in Sanford, North Carolina (10,000 sq. ft.), (2) vehicles and trailers, including 2018 Ford F-150 Raptor, two 2017 Mustang Shelby GT350s, 2017 Ford F250 Super Duty, 2016 Ford F150, 2017 Ford F450 Super Duty, 2006 Ford F350 Super Duty, 2014 Wrangler Unlimited Jeep Rubicon, 2018 Tilt Tandem trailer, 2007 Hudson Brothers trailer, 2007 Utility Trailer, 2017 Tilt Tandem trailer, and a 2016 Tilt Tandem Continental trailer, (3) commercial property, (4) luxurious art collections, (5) domestic and international travel, (6) racecar sponsorships, and (7) sporting team sponsorships.

35.     Mountaire's payments may have been commingled with assets of other North Carolina entities associated with ICE and Cronch (or utilized through those entities),

6

including: (1) BBB4U, Inc., (2) Jessica's Junk, Inc., (3) Melted Moments, Inc., (4) Install Industrial Services, Inc., (5) 4ICE Investments, LLC, (6) Cruella De Vil, Inc., (7) ICE Racing, Inc., (8) ICE Records, LLC, (9) Kenny's Gallery, Inc., and (10) Lee County Property Investors, LLC.

36.     Cronch, as the sole owner and President of ICE, had complete control of ICE and has abused its corporate form to commit the above-described misappropriation.

37.     There are no officers or directors of ICE other than Cronch, and he siphoned/commingled ICE funds with his personal funds to facilitate his lavish lifestyle.

38.     Upon information and belief, ICE was inadequately capitalized to support the business it was running and to account for the risks and liabilities inherent in said business.

39.     Upon information and belief, ICE did not maintain required corporate records or comply with corporate formalities related to corporate filings and documentation.

### Completion Damages and Delay Damages

40.     ICE's breaches in (1) failing to continue work on the Parking Lot and the Mezzanine; (2) failing to complete work on the projects as agreed; (3) failing to remit payment to subcontractors after receipt of payment from Mountaire; and (4) misappropriation of funds paid to ICE, have resulted in significant damage to Mountaire.

41.     In order to ensure that work restarted on the Parking Lot and the Mezzanine at a commercial pace after the delay, Mountaire was forced to (1) establish obligations with ICE's former subcontractors at the Site; and (2) bring current through satisfaction or

7

settlement all subcontractors who were not paid by ICE (even though Mountaire had submitted payment to ICE for the supplied labor and materials).

42. Mountaire's current accounting of agreed payments to date for former ICE Parking Lot subcontractor S.T. Wooten Corporation for amounts paid to ICE is $465,000.00.

43. Mountaire's current accounting of agreed payments to date for former ICE Parking Lot subcontractor P.R. Faulk Electric Company for amounts paid to ICE is $2,880.00.

44. Mountaire's current accounting of agreed payments to date for former ICE Parking Lot subcontractor Caviness Farms Grading, Inc. for amounts paid to ICE is $11,520.00.

45. Mountaire's current accounting of agreed payments to date for former ICE Parking Lot subcontractor ESC Southeast, LLP for amounts paid to ICE is $6,897.24.

46 Mountaire's current accounting of agreed payments to date for former ICE Mezzanine subcontractor Wilson & Lysiak, Inc. for amounts paid to ICE is $25,200.00.

47. Mountaire's current accounting of agreed payments to date for former ICE Mezzanine subcontractor Industrial Piping Solutions, Inc. for amounts paid to ICE is $114,387.50.

48. Mountaire's current accounting of agreed payments to date for former ICE Mezzanine subcontractor Sunbelt Rentals, Inc. for amounts paid to ICE is $10,000.00.

49. Mountaire's current accounting of agreed payments to date for former ICE Mezzanine subcontractor Jourdan's Insulation, Inc. for amounts paid to ICE is $8,871.15.

50.     Mountaire has not fully resolved all payments to subcontractors and the amounts are likely to increase.  Mountaire also has hired a new general contractor for the Parking Lot at an estimated cost of $1,186,874.00.

51.     Currently, known estimated cost overruns on the Parking Lot as a result of ICE's breach are at least $1,778,640.97.

52.     Currently, known estimated cost overruns on the Mezzanine as a result of ICE's breach are $10,665.54.

53.     Mountaire's project timeline at the Site has been significantly delayed by ICE's breaches.  Mountaire will incur additional damages including lost profits based on the delayed completion of the projects.

## COUNT I
## Breach of Contract
## Defendant Industrial Construction Experts, Inc.

54.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

55.     The Parking Lot Contract is a valid contract supported by consideration in which ICE agreed to serve as contractor and oversee and manage the design and construction of the Parking Lot in exchange for payment of the sum of $7,606,972.00 (plus approved change orders) under the terms of the Parking Lot Contract.

56.     Mountaire performed all of its obligations under the Parking Lot Contract. ICE breached the Parking Lot Contract as described above.

57.     As a result of ICE's breaches of the Parking Lot Contract, Mountaire has and continues to suffer substantial and ongoing damages in an amount to be determined at trial, but reasonably and currently believed to exceed $1,778,640.97.  Mountaire also

9

is incurring damages from the delay in completion, in an amount to be determined at trial.

## COUNT II
### Breach of Contract
### Defendant Industrial Construction Experts, Inc.

58.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

59.    The Mezzanine Contract is a valid contract supported by consideration in which ICE agreed to serve as contractor and oversee and manage the design and construction of the Mezzanine in exchange for payment of the sum of $316,316.00 (plus approved change orders) under the terms of the Mezzanine Contract.

60.    Mountaire performed all of its obligations under the Mezzanine Contract. ICE breached the Mezzanine Contract as described above.

61.    As a result of ICE's breaches of the Mezzanine Contract, Mountaire has and continues to suffer substantial and ongoing damages in an amount to be determined at trial, but reasonably and currently believed to exceed $10,665.54 for cost of completion.  Mountaire also is incurring damages from the delay in completion, in an amount to be determined at trial.

## COUNT III
### Piercing the Corporate Veil
### Defendant Kenneth W. Cronch

62.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

63.    Cronch's complete control and ownership of ICE, and ability to abuse the corporate form, is reflected by the following:

a. ICE was inadequately capitalized to support the business it was running and to account for the risks and potential liabilities inherent in said business;

b. ICE did not comply with corporate formalities with regard to corporate filings and documentation;

c. Defendant Cronch is the sole owner and shareholder of ICE;

d. Defendant Cronch siphoned funds and commingled ICE funds with personal funds to purchase things such as a vacation home and a race-car team;

e. There were no other officers/directors of ICE and/or other officers were not functional and played no role in the company; and

f. ICE did not maintain required corporate records.

64.     Cronch used the corporate form to misappropriate funds and commit other wrongs against Mountaire (and others participating in the Project) in contravention of their legal rights.

65.     It is further believed that Cronch used the fraudulently obtained and transferred assets for his own pleasure and to fund other business ventures he owns and controls.

66.     As a result of said conduct, ICE is insolvent without sufficient assets to compensate Mountaire for the damages it has suffered as alleged herein.

67.     Accordingly, ICE's sham corporate form should be disregarded and Cronch should be personally liable for the ongoing financial losses being incurred by Mountaire.

## COUNT IV
### Fraudulent Transfer in Violation of N.C. Gen. Stat. § 39-23.4
### Defendants Industrial Construction Experts, Inc. and Kenneth W. Cronch

68.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

69.     Defendants abandoned the projects, closed ICE's doors, and transferred ICE's money and assets to Cronch and/or to other business entities owned and controlled by Cronch.

70.     When Defendants made the transfers, Mountaire had substantial claims extant against them.  Defendants made said transfers with knowledge of the claims Mountaire had against them and with the intent to hinder, delay, and defraud Mountaire.

71.     Facts demonstrating Defendants intent to hinder, delay, and defraud Mountaire include:

> a. The transfers were to insiders, namely, Cronch and his controlled entities;
>
> b. Defendants retained possession or control of the property transferred after the transfer;
>
> c. Defendants did not disclose the transfers to Mountaire;
>
> d. The transfers were of substantially all ICE's assets;
>
> e. Defendants made the transfer with full knowledge that they had not paid subcontractors on the projects;
>
> f. Upon information and belief, ICE did not receive anything, much less reasonably equivalent value, for the transfers.
>
> g. At the time of the transfers, Defendants liabilities exceeded their assets.

72.     For the reasons stated and pursuant to the North Carolina Uniform Voidable Transactions Act, N.C. Gen. Stat. §§ 39-23.1 *et seq.*, the transfers were fraudulent as to Mountaire.

73.     Pursuant to N.C. Gen. Stat. § 39-23.7(a), Mountaire is entitled to entry of judgment (a) avoiding the transfers; (b) granting an attachment against the transferred

property; (c) enjoining Defendants from further disposition of the transferred property or other property; and (d) other relief as may be just and proper.

74.     Pursuant to N.C. Gen. Stat. § 39-23.8(b), Mountaire also is entitled to entry of judgment against the transferees in the amount of the value of the transferred property.

WHEREFORE, Mountaire requests the following relief:

A.     On account of its First and Third Claims for Relief, Mountaire have and recover from Defendants, jointly and severally, an amount to be determined at trial but reasonably and currently believed to exceed $1,778,640.97;

B.     On account of its Second and Third Claims for Relief, Mountaire have and recover from Defendants, jointly and severally, an amount to be determined at trial but reasonably and currently believed to exceed $10,665.54;

C.     On account of its Fourth Claim for Relief, the Court enter a judgment (a) avoiding the transfers; (b) granting Mountaire an attachment against the transferred property; (c) enjoining Defendants from further disposition of the transferred property or other property; and (d) holding transferees liable for the transferred property or the value thereof;

D.     An award of prejudgment and postjudgment interest, as well as its attorneys' fees and costs, all to the extent authorized by law; and

E.     Such other and further relief as the Court may deem just and proper.

This the 18th day of December, 2018.

/s/ Scott M. Tyler
Scott M. Tyler
John T. Floyd
MOORE & VAN ALLEN, PLLC
Bank of America Corporate Center
100 North Tryon Street, Floor 47
Charlotte, North Carolina 28202-4003
(704) 331-1000
scotttyler@mvalaw.com
johnfloyd@mvalaw.com

ATTORNEYS FOR PLAINTIFF